May it please the court. Good morning. Brian Glass for Appellant Eugene Richard Severin. I'd like to start by saying that I think the district court wrote a very good decision on the motion to dismiss. It was very well reasoned. It really captured the facts about the retaliatory animus in this case. That's more than we see in other cases. I mean we have verbal and physical threats from a principal after he found out that Mr. Severin had made a report about possible test cheating to SCI. We have 46 disciplinary actions in three months. We have a special cooling off period from the superintendent because the relationship had gotten so sour. We have a finding by a first arbitrator that found, James Brown found, that there was animus in his decision. So I think the first issue about, you know, is it a substantial motivating factor for his termination and for the things that happened to him. I don't think that's a hard issue for the court to find that that should be for a jury because even if you said that the termination was warranted under subsequent actions, there's a lot of retaliatory actions that happened before he even got to termination, like 46 disciplinary letters. Yeah, but I am, I mean, I don't have much problem with the fact that there were other things, but the initial actions could be unless they are covered by Garcetti and Weintraub, you know. The question for me is, was he speaking as an outside public citizen or just as an employee? Yeah. Yeah, I'm glad you recognize I do think that's the murkier issue. And in fact, the city didn't even move to dismiss initially on the motion to dismiss. They didn't even raise the First Amendment argument. So we did all this discovery and then all of a sudden here we get the First Amendment issue, which is usually addressed on a motion to dismiss, in my experience. Well, I think Weintraub is a grievance. The grievance had been filed in that case. So you could distinguish that on the basis that he went to SCI. And I think SCI has been recognized as open to anybody can file with SCI. It's like an inspector general for the city. I do think that, you know, regents proctoring in general is, can be done by anyone. It doesn't even have to be done by a teacher. So I know that the hardest thing is the part and parcel of the job duties that Weintraub is, but, you know, he wasn't even really part of the school officially at that point. He just happened to brought in on the first interview, come in and look at this and saw the conduct that the principal was trying to engage in. But doesn't the SCI website have a, as the district court points out in her opinion, a description of reporting obligations of employees of the public school system? And why wouldn't that cover your client's obligation here? Well, it raises two problems. First, I think it's a little murky about what the duty to report and when there's a duty to report. I also just want to posit it occurred to me that if you think about as an employee in a situation like that, if he has a duty to report, isn't that a license for the prince and the principal finds out about it? Isn't this a license to basically retaliate against them with impunity if we can't hold them accountable? Well, that's the underlying problem in Garcetti and Weintraub. I mean, that's there all the time, which is why I don't like them. But wasn't this typically the sort of thing that somebody did wrong in employment and another employee, as an employee, had a duty to speak to the union, to do this, to do all the things that your client did. But as an employee, I'm not saying that the issue wasn't important enough so that First Amendment involvements are there. It's not a part of it. It's entirely whether under our cases, what he was doing was under an employee. And what you're saying is a problem, but it's a problem of that whole line of cases. Well, I think it's been murky for years, I think, the First Amendment since Garcetti. You look at each individual facts of each case, and I think there's some murky elements here. I don't know if the motive is all that relevant here. The city seems to be arguing that, well, he really didn't have that much concern about it until later. I think it's not so clear that there is a duty to report SCI and everything here. And so I don't think that's the relevant issue to be decided. I think you have to kind of look at the balancing test. There's also, I think, Sousa v. Roke says, if it's a close question, it should go to the jury. And so I do recognize that is tricky in these cases. But here there's a murkiness, and even the city, by not even moving to dismiss, has kind of recognized the murkiness here. And I do think that it's important for someone in this situation to have some right to protect himself when he tries to do the right thing. And he did report serious misconduct. And one thing about this record, you know, they did a good job sort of making Mr. Severin look terrible. But look at the principal we're talking about here. We got a guy who got test shooting. We got Mr. Barnett. Ms. Barnett is represented by separate counsel because they had an inappropriate relationship, and she claims he retaliated against her. So a lot of things came out of this record to suggest this is like not a good guy. I'd say Mr. Severin is a choir boy compared to this. I mean, I don't see what is alleged that the public would care about involving a student who had already indisputably failed. I mean, they couldn't go back and change her results, right? Well, I think it has to do with the integrity of the testing. I think it has to do with the integrity of the principal's willingness to change answers to let the student pass. And I think his reaction when he caught... No, no, no, but the student already failed though, right? I mean, is what the fact of the matter? I think that the suggestion was that the principal was trying to change her answer so she could get enough points to pass the test. But to change the answer on a student who already failed? Yeah, so that she would pass the exam so that she would... Okay, so the public concern is what? Changing answers for a student who's already got the results of failing? The integrity of the testing, the regent's testing process, that he was going to try to change the answer until Mr. Severin saw what he was doing and he changed it. He covered it up right away when Mr. Severin questioned sort of what he was doing there, which was to change the testing process. So I do think, I did have another case, I think Judge Livingston was on the panel, Portello years ago, that went to trial. And ultimately, Mr. Portello's lost, but it was an issue about he reported his principal for budget fraud. And so you could argue that also would be potentially, you know, if you're in the school and you have some interest in, you know, how the money's spent. Was it specific enough? Where do you think is the public concern in your complaint that you think would be specific enough for us to assess whether or not it was a matter of public concern? Do you have a paragraph that you think? Yeah, I'd have to pull up the complaint at the moment. But I do think that, I don't think it was even really a challenge that by even the district court or the city that there was a public concern on it. The point is different from whether there might be a public concern, but whether in your complaint you went from the specific instance to something that would be a general thing. It is that in your complaint, you didn't talk about the specific student, but that a principal of that sort would be doing something that the public at large. And I think that's what my fellow judge is questioning about the complaint. Okay. On the rebuttal, if I can take a look at that for a moment. But I think the very fact that he went to SCI and the union suggested he did plays into this notion that they thought this was an issue beyond just one little thing. That this had to do with the integrity of the testing process. That's a different thing from a complaint. That's the question. I see. But I do think that was sort of what was addressed in the discovery part of this. So I do think there's a murkiness of the factors in all these cases, as I understand. I think you could argue in a budget, why would a budgetary process issue that someone reports be different than a region's testing process? It's, you know, everything could be in the scope of someone's job duties. That's why this is such a difficult line, because they could always claim it's part and parcel of your duties. Does the SCI regulation say you have to report anything about testing? It's so broadly written that it's just not really clear when you have to go and when you don't have to go. And if that was the case, everyone would be reporting everybody under that standard. So they try to keep it as broad as possible to try to capture all corruption. But that's why they exist. And we're not going to have every employee coming back that knew about this. Maybe he had a duty to report himself. So you're just going to- I'm going to ask you. You have limited time. So let me ask, do you want to address briefly the alternative ground the district court relied on, the Mount Healthy defense, in light of the fact that your client was found to have committed various acts of misconduct in the arbitrations? Well, two things. Again, I mentioned Portelis. That was an issue that the jury decided. It was put as a jury instruction. So I think that's the appropriate time to address that. The other issue, again, is I think it's more of a damages cutoff question here, because I don't think- Remember, the standard is some adverse action. And so before you even get to his termination, we've had multiple adverse actions of disciplinary letters and 46 letters. So that by itself, even if you get to step one with Judge James Brown's decision, you could just limit damages to that point and say, was he retaliated for that activity? And that was still within the timeliness of it. So I would say that even at the end, I would argue that essentially you might say that by a limitation on damages ultimately, if you found that there was some basis to ultimately terminate him. But I do think that you could still have a question for jury, was a substantial motivating factor for these letters and everything that followed and all these comments? And would that dissuade a reasonable person from coming forward under those circumstances? So I don't think that's the heart of the case. Okay, thank you. Good morning, Your Honors. Julie Steiner, the attorney for the appellees. I'm going to start in the reverse and follow up on your question, Your Honor, regarding the Mount Healthy defense. Even if plaintiff had engaged in protected speech, which we say he did not, he would have been fired anyway. And that is the basis of the Mount Healthy defense. Even if there is some evidence of retaliation, the defense allows us to show that he would have been fired anyway. Yes, that would deal with the firing. But it wouldn't deal with the allegedly adverse actions that were taken before he was moved to another school. That is, the fining and that. And that is what you would have to address, because that is enough. I mean, we've just had the Supreme Court opinion about being transferred and how that means. So that, yes, that deals with the second, with the firing. But it doesn't deal with the first actions that the principal supposedly took in retaliation. But the Mount Healthy defense allows you to make the assumption that he did retaliate, which we disagree with. So if you look at every action that Principal Dorsley took and say that was retaliation, you then allow the Mount Healthy defense, which is he would have been terminated anyway. In particular, much of the charges and specifications that were lodged against him occurred even before the plaintiff is asserting that he made this report to SCI or spoke to his union rep. So there's a causation issue in addition. You are saying that he did enough negative things so that even as to the fining and as to the transfer to the other school, there would be a Mount Healthy defense. I'm saying if this court were to, I don't agree that what happened was retaliatory. But what I'm saying is that if this court were to find that his actions were, the Mount Healthy defense comes in. But now getting back to the- And so can I ask, I just want to be very specific about the different events. Do you take the position that the second arbitration would have happened if not for retaliatory? Absolutely. Do you think that there's no question of fact on that? That there's nothing left to dispute on that? Regarding the second set of charges? Second arbitration. Yes, absolutely. I mean, you even have half or a few of the second set of charges were not even from Dorsley himself. It was from the second school that he was transferred to. And you had his students testify and complain about him. You had other individuals who observed his actions in that school. So there would be no question of fact that this second set or this second arbitration would not have occurred. And he would not have been fined. That's what led to his firing was the second set. And it just cumulatively with that arbitrator, he was able to say, look- What were the second set of charges that were independent of the principal? So the second set of charges were- Excuse me. That he fell asleep, that he was vulgar. There were quite a few. Yes. And when- So at that point, the arbitrator found that that was enough for termination. He then, plaintiff, brought in Article 75 to challenge that. And the Supreme Court then said, oh my goodness, we're talking about a very heinous conduct, unbecoming of a teacher that has absolutely no place in our education system, that was destructive to the student's health and well-being. So there is no question of fact on the manned healthy defense that he would have been terminated anyway. That's why I go back to whether there was retaliation earlier, and whether what he had done earlier would be enough, or whether that earlier was covered by Garcetti, or by a failure to plead that that was a First Amendment concern. So I'll go to the Garcetti factor, Your Honor. And I appreciated that you had pointed out that this is a very specific, discreet situation. You have clearly, and I'm not going to deny, that there was tension between these two individuals. But his plaintiff's comment to his union rep, his statement to his union rep, that was clearly, and this is the key, part and parcel of his activities, part and parcel of his job duties as a social studies teacher, proctor, and grader. It was owed his existence to his employment as a social studies teacher. So I just want to, if you could help tease out how this relates to Weintraub. My takeaway from Weintraub, as it relates to this case, is that there a plaintiff was found to be an employee who was reporting a grievance and demanding that protective measures be taken against a supervisor. So what was the equivalent workplace grievance in your position that severed, furthered by reporting the test-related? So to the extent, so. I mean, or is just Weintraub not the best case for you? I mean. Yeah, I mean, I don't think it was. I mean, we cited Weintraub, but I don't think it was, you know, it was among many cases that we felt that were quite dispositive. But in Weintraub, the teacher's reports were about an administrator failing to punish a student, which was part and parcel of that teacher's responsibilities. So here what you have is to the extent that he believed that he observed or was being asked to change a test result, that would be, that's common sense that as a teacher you have an obligation. But that's not a grievance, though. No, it is. Would you disagree that that was what Weintraub turned on, was just categorizing the supervisor needs to take protective measures was a workplace grievance? Is this how is protecting or how is reporting the test irregularities a grievance? Or, again, you can walk away from Weintraub. We have other cases. Yeah, I would walk away from Weintraub in the sense that the grievance here really was, and, again, there's not a tension, but there is a little bit of an overlap between the two parts of Garcetti. The grievance here was really a personal grievance. He went, he never even, he admits, I don't even think that there was anything going on or, you know, maybe initially he said, ooh, but he never went and reported this, what he thought was an alleged, you know, request to change a test grade. But you're saying that when an administrator tells a teacher that they should change a grade, that that is a personal grievance. I mean, when I was dean, occasionally there would be people who would come and tell me, so-and-so has complained about grades and said that this teacher grades too hard or too, and, you know, that's part and parcel of that business. Well, exactly. I mean, so I think I was maybe confusing the two regarding public concern. I mean, as I said, there is some overlap. But, yes, he never once thought that this was a huge matter of public concern, I need to take it to the press, I need to say something beyond what he said, which was the only reason I'm being undermined, as his terms were, was because I maybe made a gesture and said, ooh, I'm not going to change the test grade. It was all personal. And in this respect, to the extent he even thought that this was some issue greater than himself, it's still part of his employment. The only reason he went to his union rep, which is the first P of this analysis, was because he thought that the principal was undermining him for some time, and he didn't know why. And he even said, I really couldn't figure out why. And then only when he was pressed by that union rep as to what was the reason, did he then say, oh, wait a minute, maybe it was that incident with the student. So, again, it's all relating back to a personal grievance. And in any event, it was something that he as a teacher, any teacher, in common sense language, would have then done, would have reported it anyway. So you're saying that people doing per-session summer work have the same responsibilities as a full-time tenured teacher. Absolutely. And he was on the, I mean, he was, maybe he was not yet, it wasn't the fall session where he was in a classroom, but he had already been hired, and he was already working in the school as a proctor, grader. You can concede that something like that might have also public things. Suppose that one of the reasons that there was this was a suggestion that the student was either conservative or liberal or something, and that for that reason, the suggestion that the grade should be changed, that might be something that would warrant a broader general grievance, but there's no allegation of that here. Well, yes. So, number one, yes, it could touch on, and that's the key, it could touch on a matter of public concern, but on the facts of this case, this was definitely not a matter of public concern. He never even thought it was one. It was all, relates back to his personal grievance with Principal Dorsley. He never even, he even admits, I didn't think it was anything when it happened. Thank you, Your Honors. We ask that you affirm. First, I'm actually surprised that we've been talking public concern today, because if you read the district, the summary judgment decision on page 18, Special Appendix 34, defendants do not dispute that Severance's complaint touched on a matter of public concern, and of course, the public generally has an interest in whether New York City public school principals are altering statewide standardized test scores. However, so that's what, it was not even addressed by the district judge decided as a matter of law, and the defendant didn't even concede it until today, I mean, didn't even dispute it. The district court also went on, yeah, public, I mean, yeah. Addressing Judge Perez's concern, on paragraph 23, we did allege that the UFT district rep perceived this as a testing impropriety incident, and so, again, I think the district judge saw this as this is about changing regents' grades, and Judge Calabresi, to your point, you know, when you were dean, it's a little different than if you say this is too hard a grader. This is a guy, had nothing to do with this test at all. He was just brought in, and he saw what they were trying to do was pass this girl who didn't pass the regents to please the mother, and so he kind of raised a little bit of an eyebrow about this, and that's why the principal backed off because he was caught. So that does implicate a broader public purpose here. We're not talking about, hey, this is just one incident, it's too hard a grade. We're talking about, hey, this is changing the state regents' exam, and as, you know, any proctor, as I said, doesn't have to be a teacher to be a proctor. You know, he has nothing to do with grading this exam. He was just brought in maybe to provide some help to this girl in the future, but he's just raising, like, this guy, I just got hired by this guy, and he's changing grades, and I'm raising it, and because he brought that up, this record is ripe with evidence. I've never seen, we have smoking gun evidence of retaliation, and they keep calling it tension. It's animus. James Brown found animus. A hearing officer sat through days and days of this and said, there's retaliatory animus. There's a cooling off period. So, you know, it's just to take this guy out of his chance to stay in court over this, and I get it. It's seven years later. This is hard for a district court to do, but I think the guy deserves to stay in court like Mr. Portelis did, and if he loses, he loses. Let a jury decide that, so. Your colleague took the position that if not for, that the second arbitration would have happened, even if it had not been for retaliation on the part of Dorsley. Would you respond? Yeah, absolutely. What's so unusual about this case that I found offensive was that five of the seven charges in the second case were from the old school. So the minute after they weren't successful in terminating the first time, a month later, and it's actually the district judge wrote it this way, a month later they charged him with new charges because they didn't win the first time. So could you imagine a system where we're going to charge each specification separately. If we lose the first time, we don't get a good result. We'll go to another arbitrator on the panel, and we'll bring a second set of charges, and if we don't do that, we'll have another arbitrator go to a third set of charges. The way the New York City panel works, and they know this quite well, is that we have this rotating panel of arbitrators. So James Brown used to be a plaintiff's lawyer who saw the case much differently than Richard Williams, who has a different reputation. So all they did is they just said we didn't win the first time, so we'll come up with a whole new set of charges. We'll add a couple from the new school. There was no problem in the new school. They just were looking for new stuff because they lost the first time, and they were upset they lost the first time. And again, to characterize Mr. Severin as this horrible man, when you have a principal who's engaged in test cheating, who's had an inappropriate relationship with an AP, and he sits there scot-free while my client loses his job and his career and has suffered tremendous, devastating economic impact, to me is offensive. I think he should have a chance to tell that to a jury. Thank you. Thank you both, and we will take the matter under advisement.